628 So.2d 168 (1993)
STATE of Louisiana, Plaintiff-Appellee,
v.
Birdette BARKER, Defendant-Appellant.
No. 25461-KA.
Court of Appeal of Louisiana, Second Circuit.
December 1, 1993.
*171 Indigent Defender Office by Richard E. Hiller, John M. Lawrence, Allan R. Harris, Shreveport, for defendant-appellant.
Richard Ieyoub, Atty. Gen., Paul J. Carmouche, Dist. Atty., Rebecca I. Bush and Catherine M. Estopinal, Asst. Dist. Attys., for plaintiff-appellee.
Before NORRIS, STEWART and WILLIAMS, JJ.
NORRIS, Judge.
Birdette Barker was charged by indictment with two counts of aggravated rape of 12-year old "V.H." La.R.S. 14:42. After a jury trial, Barker was found guilty as charged. The trial court subsequently imposed the mandatory sentences of life at hard labor without benefit of parole, probation or suspension of sentence, and ordered them to be served consecutively. Barker now appeals, advancing 10 assignments of error, seven of which have been argued on appeal.[1] For the reasons expressed, we affirm.

Factual background
On the night of September 10, 1991 around 9:00 p.m., V.H. and her 18-year old sister, A.L., were walking down a street in the Martin Luther King area north of Shreveport. They were en route to their grandfather's house, where they were living, on Lanier Street. On the way, they ran into Birdette Barker and two of his friends, James Ray Evans and Robert Bradford. A.L., a crack cocaine addict, knew Barker and Evans, and went up to talk to them out of V.H.'s earshot. V.H. did not know the men. According to A.L., the men agreed to give her a rock of crack in exchange for V.H. performing oral sex on them. According to both A.L. and V.H., V.H. was not told what would be required of her in the transaction. A.L. lit up and smoked the rock right in the street.
A.L. then came back to V.H. and asked if she felt like walking some more. V.H. followed A.L. and the three men for about three blocks to a house on Nena Street, which she later learned was Barker's. V.H. testified she never would have entered the house had she known what the men expected of her.
She followed them in, however, and Barker locked the front door behind her. A.L. went into the rear bedroom with Evans and Bradford. V.H. stayed in the front room, watching TV. Barker came in from the kitchen, dimmed the lights, sat down next to her and offered her some beer. He then asked her if she was a virgin, and if she had ever sucked a penis before. She replied no. He then asked her to suck his penis. When she refused, he grabbed a hammer and threatened her. Out of fear she complied, performing fellatio on him in the living room.
After this was done, Barker went to the bedroom door and told the others to come out. They did so, and Barker asked A.L., "What about my friends?" A.L. offered to "take care of them" herself, but Barker insisted on "fresh meat." Still holding the hammer to V.H.'s head, Barker led her into the bedroom, answering her remonstrances, "it ain't what you want to do." He then had sexual intercourse with her.
When this was through, V.H. put on her clothes, came to the living room and told A.L. she was ready to leave. However, Barker told her, "you're not leaving," and ordered her back into the bedroom. Evans and Bradford followed her in and shut the door. V.H. struggled as they pulled her clothes off, and momentarily she got away to the door. Barker, still in control of the situation, told her that if she would "take care of them" she could leave. Bradford pulled her back into the bedroom. Evans then said they had something to make her feel better: a crack *172 pipe. Still intimidated by the hammer, she smoked the crack in the bathroom. At this point Barker handed the hammer to Bradford, who with Evans took V.H. back into the bedroom. There they made her perform oral sex on both of them, and Bradford performed vaginal and attempted anal intercourse with her, over a space of several hours. At one point, because she was screaming, they stuffed a pillow over her face. Eventually, Evans left the bedroom but Bradford stayed in, telling V.H. he wanted to be her boyfriend.
Around 3:00 a.m., Barker and Evans left to get something to eat from Evans's house. At this point A.L. escaped through the back door and ran to a friend's house. The friend went with her to the Peach Street Apartments, where A.L. called the police. The police promptly came, picked up A.L. and the friend, and drove them back to Barker's house on Nena Street. By this time, Barker and Evans had also returned to the house. V.H., who was still in the bedroom with Bradford, recalls that they started banging on the bedroom door and shouting that A.L. had got away to call the police. Bradford told V.H. to get dressed and offered to walk her home. They got halfway down the driveway, with Bradford still kissing and hugging her, when the police car pulled up. Evans tried to run; Bradford stood there with V.H.; both were taken into custody. Barker stayed in the house a while longer, but he eventually came out and was also taken into custody.
Corporal Moore gave Barker his Miranda rights. At first Barker claimed to know nothing about A.L.'s allegations. Shortly, however, he admitted having sex with V.H. but claimed that she consented. He was then placed under arrest.
While at the scene, A.L. and V.H. were placed in the same police car together. V.H. told A.L. that all three men had raped her. According to V.H., A.L. replied that "If you'd done what I told you [complied with the men], none of this would have happened." V.H. also testified that A.L. instructed her to go along with whatever A.L. told the police, as A.L. intended to lie to them. According to V.H., A.L. told officers that they had been walking around looking for their uncle when they ran into Barker, who said the uncle was at Barker's house on Nena Street, and he could prove it by showing them the uncle's cap; they followed Barker into the house for this purpose only. Later that morning, at the LSU Medical Center, V.H. repeated essentially the same story to Officer Jackson, but said that Barker was wearing the uncle's cap when they met him on the street.
Both V.H. and A.L. nevertheless testified that their descriptions, both at the scene and at trial, of the sexual assaults inflicted on V.H. were accurate. V.H. insisted at trial that she never consented to any of the men's sexual acts.
Over 24 hours after his arrest, Barker was again advised of his Miranda rights and waived them. He gave a recorded statement, admitting that he and Bradford had sex with V.H. at the house, but claiming they thought she was 17 and that V.H. agreed to everything in exchange for the crack cocaine. At this time Barker also consented to a search of his house. Among other things, a hammer and crack pipe were seized.

Discussion: The Motion to produce
By his first assignment Barker urges the trial court erred in denying his motion to produce the grand jury testimony of A.L. and of V.H. By his second, he requests that the sealed grand jury transcript be made a part of the appellate record. The thrust of these arguments is that the witnesses' grand jury testimony is inconsistent with their other statements concerning the incident. Barker contends that the state relied almost exclusively on these witnesses' testimony and, as such, their credibility was indispensable to the question of guilt or innocence; thus the court's refusal to grant the motion to produce, Barker argues, violated his constitutional rights.
At the outset we note that Barker never specifically requested the production of A.L.'s grand jury testimony. He requested only the victim's testimony. R.Vol. 7, p. 1. A party seeking the disclosure of grand jury testimony bears the burden of showing a particularized need for violating the secrecy *173 of the grand jury proceedings. State v. Farris, 491 So.2d 464 (La.1986); In re Grand Jury Testimony, 832 F.2d 60 (5th Cir.1987). The instant motion, requesting only V.H.'s testimony, is obviously not particular or specific enough to encompass A.L.'s too. For this reason, the trial court was not plainly wrong to fail to order the production of A.L.'s grand jury testimony.
As for V.H.'s testimony, one of the guiding principles of grand jury proceedings is secrecy. La.C.Cr.P. art. 434 provides in part:
Members of the grand jury, all other persons present at a grand jury meeting, and all persons having confidential access to information concerning grand jury proceedings, shall keep secret the testimony of witnesses and all other matters occurring at, or directly connected with, a meeting of the grand jury. However, after the indictment, such persons may reveal statutory irregularities in grand jury proceedings to defense counsel, the attorney general, the district attorney, or the court, and may testify concerning them. Such persons may disclose testimony given before the grand jury, at any time when permitted by the court, to show that a witness committed perjury in his testimony before the grand jury. A witness may discuss his testimony given before the grand jury with counsel for a person under investigation or indicted, with the attorney general or the district attorney, or with the court.
The Supreme Court has consistently held that a defendant is not entitled to production of a transcript of the secret grand jury proceedings against him. State v. Peters, 406 So.2d 189 (La.1981); State v. Williams, 310 So.2d 528 (La.1975). The transcript may not be used at trial even to conduct cross examination. The purpose of this rule is not to protect a defendant or witness at a subsequent trial, but to encourage the full disclosure of information about the crime. State v. Sheppard, 350 So.2d 615 (La.1977).
The rule of secrecy, however, is not absolute. Grand jury testimony may be disclosed pursuant to one of the codal exceptions (statutory irregularities, perjury before the grand jury). C.Cr.P. art. 434 A. Also, when the defendant requests it, the state must produce evidence that is favorable to the accused, if that evidence is material to guilt or innocence. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Brady rule also applies to evidence which impeaches the testimony of a witness when the credibility of that witness may be determinative or guilt or innocence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Davenport, 399 So.2d 201 (La.1981). In short, the secrecy of grand jury proceedings cannot be used to thwart a defendant's constitutional rights. State v. Peters, supra. To strike a balance between the accused's right to confront his accusers and the state's interest in maintaining secrecy, the Supreme Court has authorized an in camera inspection of grand jury transcripts to determine whether they may be used for impeachment purposes. Id., 406 So.2d at 191. Ultimately, disclosure is within the trial court's sound discretion. State v. Trosclair, 443 So.2d 1098 (La.1983), cert. dism. 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984); State v. Evans, 512 So.2d 615 (La.App. 2d Cir.1987), writ denied 516 So.2d 367 (La.1988).
Barker's request for V.H.'s grand jury testimony does not meet the exceptions of art. 434. He is not claiming that her grand jury testimony was perjured; to the contrary, he concedes it was truthful, but merely inconsistent with statements she made to other persons before she went to the grand jury. Thus this request does not satisfy the statutory criteria for opening the grand jury testimony.
To satisfy Barker's constitutional claim, the trial court inspected the testimony in camera. The court found "nothing, absolutely nothing exculpatory * * * that would assist the defendants." R.Vol. 4, p. 3. Given the trial court's compliance with State v. Peters, and his finding of no exculpatory material, we perceive no error in his decision to keep the transcript closed. Barker finally urges he did not know which of the sisters' "many stories they were planning on using at trial." At trial, both sisters admitted their *174 earlier falsehood and the true version of why they went to Barker's house. It is apparent that Barker was able to convey to the jury, through the young ladies' trial testimony, exactly the same inconsistencies he sought to develop through their grand jury testimony; he does not now urge that he was denied any additional exculpatory evidence. On this record we find no abuse of discretion and no reversible error.

Motions to suppress and quash
By his third assignment Barker urges the trial court erred in denying his motion to suppress and his motion to quash. The first seeks to suppress Barker's statements given some time after his arrest, as well as physical evidence seized from the house on Nena Street. The second contests the indictment on racial grounds.
At the hearing on the motion to suppress, Barker urged that his arrest was without probable cause and thus unconstitutional. He has apparently abandoned this argument, as he now urges for the first time on appeal that he was under the influence of crack cocaine when he was informed of his constitutional rights. Because of his drugged condition, he contends, he could not (and did not) waive his rights. We note that a new basis for objection cannot be raised for the first time on appeal. La.C.Cr.P. art. 841; State v. Cressy, 440 So.2d 141 (La.1983); State v. Powell, 598 So.2d 454, 464 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (La. 1992). On this basis we would be inclined to dismiss the argument as never having been presented to the trial court.
Special circumstances, however, are present in this case. Barker's codefendants, James Ray Evans and Robert Bradford, both urged in their motions to suppress that their Miranda rights were violated and that their statements were not freely and voluntarily given. Thus, although Barker did not specifically assert Miranda grounds in his own motion, the state had notice of the issue and presented evidence as to Miranda rights and general voluntariness of all defendants' statements. We have therefore reviewed Barker's statements.
Intoxication can render a confession involuntary if the intoxication is such that it negates the defendant's comprehension and renders him unconscious of the consequences of what he is saying. Whether the level of intoxication is sufficient to vitiate voluntariness is a question of fact. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); State v. Hicks, 607 So.2d 937 (La.App. 2d Cir.1992).
At the hearing on the motion to suppress, several witnesses testified on the state's behalf. Lieutenant Lowe, commander of the Sex Crimes Unit, denied that Barker appeared to be under the influence of narcotics or alcohol; on the contrary, he appeared to be physically normal and responded appropriately to all questions. R.Vol. 4, p. 88. Officer Jackson testified that when she gave Barker his rights, he did not appear to be intoxicated, medicated or incapable of understanding. R.Vol. 4, p. 41. The uncontradicted testimony of both officers is that Barker knew what he was doing. The officers also stated that he was never threatened or coerced. R.Vol. 4, pp. 42, 89. Moreover, there was no evidence before the trial court that Barker was so drugged from his earlier smoking of crack that he could not grasp the nature and consequences of his waiver. Given these facts, we perceive no abuse of discretion in the trial court's denial of Barker's motion to suppress. State v. Dewey, 408 So.2d 1255 (La.1982); State v. Hicks, supra.
Barker's other claim in this assignment is that the indictment should have been quashed because the manner of selecting grand jury foremen was racially biased and thus unconstitutional under Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). This court, however, has recently reviewed Caddo Parish's procedure for selecting grand jury foremen. In both State v. Thomas, 609 So.2d 1078 (La. App. 2d Cir.1992), writ denied 617 So.2d 905 (La.1993), and in State v. Davis, 626 So.2d 800 (La.App. 2d Cir.1993), we analyzed precisely the same claim with the benefit of extensive documentation from the Registrar of Voters and the Census Bureau. We determined that Caddo Parish's selection process *175 for jury foremen is not discriminatory. In the instant case Barker presents nothing further to dissuade us from that conclusion.
This assignment lacks merit.

Motion in limine
By his fourth assignment Barker urges the trial court erred in denying his motion in limine requesting that the state be ordered not to use the phrase "little girl" in describing the complainant during the presentation and argument of its case. Barker's motion sought to prohibit the state from using either "victim" or "little girl" in referring to V.H. After a hearing, the court granted the motion as to "victim," with the proviso that the state could nevertheless use the word in closing argument. The court denied the motion as to "little girl." R.Vol. 4, pp. 139-140.
In brief, Barker advances the correct premise that both the United States and the Louisiana Constitutions guarantee him the right to a fair trial before an impartial jury. However, he further argues that La.C.Cr.P. arts. 770 and 774 specifically ban prejudicial comments at trial; ergo, the use of "little girl" should have been prohibited. He adds that "little girl" served no useful purpose and had no probative value.
The first article cited by Barker plainly does not apply to the instant situation. Broadly speaking, art. 770 prohibits remarks by judge, prosecutor or other court official to "race, religion, color or national origin" if such remark is not material and relevant and might create prejudice against the defendant. The phrase "little girl" obviously does not fall into this category and does not entitle Barker to a mistrial.
Article 774 regulates the scope of argument. Argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. Thus counsel are permitted to make fair and reasonable conclusions from the facts in evidence. State v. Clark, 387 So.2d 1124 (La.1980), cert. denied 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981); State v. Kennon, 588 So.2d 1348 (La. App. 2d Cir.1991), writ denied 600 So.2d 634 (La.1992). Here the record plainly shows that V.H. was 12 years old at the time of the offense but had grown in size by the time of trial 16 months later. R.Vol. 1, p. 220; Vol. 2, p. 457. Admittedly, in his recorded statement to Officer Jackson, Barker claimed V.H. told him she was 17. R.Vol. 1, p. 44. However, V.H. testified at trial, enabling the jury to observe her and draw its own conclusions. On the record presented, "little girl" was a fair and reasonable interpretation of the evidence and not unduly prejudicial.
This assignment lacks merit.

Prosecutor's statement at voir dire
By his eighth assignment Barker urges the trial court erred in overruling his objection, during voir dire, to the prosecutor's statement to prospective jurors defining reasonable doubt as doubt based on "logical" or "sound" reasons. R.Vol. 6, pp. 563-564. Barker concedes that not every misstatement of law to the voir dire panel will mandate reversal, State v. James, 459 So.2d 1299 (La. App. 1st Cir.1984), writ denied 463 So.2d 600 (La.1985), but urges that the instant statement was "such an incorrect statement * * * on so important a concept" that reversal is in order. Br., 9.
The scope of voir dire examination is within the sound discretion of the trial judge and his rulings will not be disturbed on appeal absent a clear abuse of discretion. La.C.Cr.P. art. 786; State v. Murray, 375 So.2d 80 (La.1979). If reasonable persons of ordinary intelligence would have no problem understanding the definition of "reasonable doubt," then the definition is not incorrect. State v. Taylor, 410 So.2d 224 (La.1982); State v. Grant, 517 So.2d 1151 (La.App. 5th Cir.1987).
In State v. Grant, supra, the court approved a jury charge which defined "reasonable doubt" as "doubt based upon a real, tangible substantial basis and not upon mere caprice, fancy or conjecture." Id., 517 So.2d at 1157. Here, the contested definition as "doubt based upon a logical, sound reason" is not substantially different from that approved in State v. Grant. See also State v. *176 Rodney, 459 So.2d 669 (La.App. 4th Cir. 1984); State v. Augustine, 482 So.2d 150 (La.App. 4th Cir.1986). We do not find this statement of the prosecutor's to be incorrect or misleading. Moreover, this statement occurred during voir dire. At the trial itself, both defense counsel in opening statement and the judge in the jury charge instructed jurors to disregard "what the lawyers say" as not evidence. R.Vol. 1, p. 217, Vol. 3, p. 526. Under the circumstances, the effect (if any) of the prosecutor's statement at voir dire was minuscule.[2]
This assignment lacks merit.

The Brady material
By his ninth assignment Barker urges the trial court erred in denying his motion for mistrial and motion for continuance. Both motions are based on the state's failure to advise the defense of the existence of Brady material until shortly before trial, by which time Barker claims it was impossible for counsel to prepare for trial with the new evidence. The evidence at issue is the testimony of V.H. and her sister, the state's primary witnesses, that they colluded to give the police false statements as to their purpose in going to the house before the rapes occurred.
At the outset we note that the newly-revealed evidence at issue here was discovered before a full trial and conviction, thus distinguishing the case from Brady v. Maryland, supra. Brady holds that when exculpatory evidence that was requested by the defense is withheld until after trial and conviction, due process requires a reversal of the conviction. Id., 373 U.S. at 87, 83 S.Ct. at 1196. This remedy is based on the theory that the trial court had no opportunity to address and correct the prejudice created by late disclosure. State v. Ashley, 463 So.2d 794 (La.App. 2d Cir.1985). When disclosure of new evidence occurs before trial, the trial court has great discretion to fashion a remedy that will offset the potential prejudice. La.C.Cr.P. art. 729.5; State v. Baldwin, 388 So.2d 664 (La.1980), cert. denied 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981); State v. Ashley, supra at 798. A mistrial is not mandated. Granting a recess is an approved method of allowing the defendant to examine and defend against the new evidence. State v. Williams, 448 So.2d 659, 665 (La.1984); State v. Ashley, supra.
In the instant case the court granted a recess, held a conference in chambers with both attorneys, and then heard arguments on the record. The court ruled that the new evidence was not so prejudicial as to warrant a mistrial, also noting that counsel would have adequate opportunity to cross examine V.H. R.Vol. 2, p. 282. In point of fact, counsel questioned her extensively about her changed testimony and may have somewhat discredited her. However, the substance of the change affected only her activities just prior to the rape; she initially told Officer Jackson that Barker lured them into the house by showing them their uncle's red cap, but testified at trial that she followed Angela and the men to the house after Angela smoked crack she received from Barker. V.H.'s testimony as to the incidents inside the housethat Barker raped her vaginally, then encouraged Bradford to do the same, all without her consent and while armed with a hammer to subdue her resistancewas essentially unchanged. The trial court did not abuse its discretion in ruling that the new evidence did not mandate a mistrial or continuance, and that the potential prejudice could be remedied by cross examination after a recess.
This assignment lacks merit.

Consecutive sentences
By his tenth assignment Barker urges the trial court erred in imposing an excessive sentence of two consecutive life sentences without benefit of parole, probation or suspension of sentence. In brief he relies primarily on the general rule that concurrent sentences should be imposed for offenses arising out of the same act or transaction. La.C.Cr.P. art. 883; La.S.G. § 215 A(2). He also cites the trial court's misstatement that there were two victims of Barker's crimes. *177 R.Vol. 3, p. 551. The prosecutor had stated that both of Barker's offenses were directed at V.H. R.Vol. 2, p. 272. Barker timely moved to reconsider the sentence and a hearing was held; the trial court denied the motion. R.Vol. 8, p. 51.
Barker advanced a preliminary argument at the motion to reconsider. Counsel cited La.S.G. § 215, which provides in part:
Section 215. Concurrent and Consecutive Sentences
A. Factors to be Considered
1. The sentencing court may impose either concurrent or consecutive sentences in cases where a defendant has been convicted of two or more offenses. In determining whether to impose either a concurrent or a consecutive sentence, the court should consider aggravating and mitigating circumstances which may be present.
2. If two or more criminal acts are based on the same act or transaction, or constitute parts of a common scheme or plan, concurrent sentences should be imposed.
3. In all other cases, concurrent or consecutive sentences should be supported by appropriate factors. If a consecutive sentence is imposed, the court shall state for the record the factors considered and the reasons for imposition of a consecutive sentence.
Counsel argued that subsection A(1) does not apply to the case, but rather only A(2) applies as it deals explicitly with "same act or transaction" crimes. The result of this, counsel seemed to urge, was that the court could not weigh aggravating and mitigating factors but had to impose concurrent sentences for "same act or transaction" crimes. R.Vol. 8, p. 43. The trial court properly rejected this argument; the Guidelines do not change the law, but follow the jurisprudence under La.C.Cr.P. art. 883 that the sentencing court should consider aggravating and mitigating circumstances in deciding whether to impose concurrent or consecutive sentences. La.S.G. § 215, Author's Commentary (2), citing State v. Cox, 369 So.2d 118 (La.1979). A plain reading of § 215 A(1) together with A(2) shows that aggravating and mitigating facts are to be considered in any situation where concurrent or consecutive sentences are authorized. Barker's argument lacks merit.
The real thrust of Barker's argument, however, is that the trial court misapplied the factors that are traditionally used in selecting concurrent or consecutive sentences, or that it failed to give adequate weight to the mitigating factors. See, e.g., State v. Sherer, 437 So.2d 276 (La.1983), and State v. Lighten, 516 So.2d 1266 (La.App. 2d Cir.1987). We concede that several mitigating factors are present; the trial court noted one, Barker's clean prior record. Barker also urges that he is at age 25 a relatively young offender; that he was under the influence of crack at the time of the offense; A.L. was also high on crack, and she was a facilitator of the offense; and V.H. herself smoked some crack at some point in the evening. Barker stressed that even though the jury found otherwise, there was significant evidence to show (and Barker believed) that V.H. was a willing participant in the night's activities.
The court also cited, however, some impressive aggravating factors. V.H. was only 12 years old at the time of the offense; Barker wielded a dangerous weapon, a hammer; he took a lead role in influencing Evans and Bradford to participate in the crime; and the incident was protracted and unusually painful for the victim. R.Vol. 8, pp. 29-30. We would also note that Barker was the supplier of the crack that everyone used that evening, thus belying his clean prior record. Also, there was no evidence that V.H. was a drug user prior to this incident; if her ability to resist her attackers was dulled by drugs, this is Barker's fault.
We concede that the trial court's failure to mention various mitigating factors casts some doubt on his compliance with S.G. § 215 A(3). We also recognize that when all mitigating and aggravating factors are properly balanced, the question is closer than the trial court treated it. After careful review, we are constrained to hold that the aggravating factors, especially the wild brutality of the whole evening, Barker's leadership role in the heinous acts, and his distribution of *178 controlled dangerous substances to initiate the crime, outweigh the mitigating facts cited by counsel. The court's sentencing choice was not an abuse of discretion. State v. Williams, 445 So.2d 1171 (La.1984). This assignment does not present reversible error.

Conclusion
Finally, we have reviewed the entire record and find nothing we consider to be error patent. La.C.Cr.P. art. 920(2). For the reasons expressed, we affirm Birdette Barker's convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Assignments neither argued nor briefed are abandoned. URCA Rule 2-12.4; St. v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ den. 558 So.2d 1123 (La.1990).
[2] Curiously, counsel did not object when the prosecutor used the same definition of "reasonable doubt" at voir dire earlier the same day. R.Vol. 5, p. 407.